[No. B135799. Second Dist., Div. Five. Jan. 22, 2001.]

GULF INSURANCE COMPANY, Plaintiff and Appellant, v.
TIG INSURANCE COMPANY et al., Defendants and Appellants.

COUNSEL

Jean Ballantine and Larry A. Rothstein for Plaintiff and Appellant.

Haines, Brydon & Lea, James G. Boedecker, James E. Gibbons and Patrick M. Quigley for Defendants and Appellants.

OPINION

TURNER, P. J.—

## I. INTRODUCTION

Plaintiff, Gulf Insurance Company (Gulf) appeals after a final judgment was entered in its favor and against defendants, TIG Insurance Company and TIG Insurance Company of Michigan (TIG). The appeal is from an order sustaining demurrers to Gulf's claims for breach of contract and of the implied covenant of good faith and fair dealing in the original complaint. The only issues raised in the appeal relate to the claim for violation of the implied covenant of good faith and fair dealing. The claims arose as a result of Gulf's acting as surety on a performance bond. The performance bond was issued in connection with a construction contract entered into between Gulf's principal, Santa Susana Construction (Santa Susana), and the obligee, the County of Los Angeles (the county).

After the demurrer was sustained to the breach of contract and implied covenant of good faith and fair dealing causes of action, the case proceeded to a court trial on Gulf's remaining claims for declaratory relief, equitable indemnity, and contribution. Eventually, judgment was entered in Gulf's favor in the sum of $43,593. TIG cross-appeals from the judgment entered on Gulf's claims in the first amended complaint for declaratory relief, equitable indemnity, and contribution. TIG's cross-appeal is based on the ground that no judgment should have been entered against it. This, it is argued, is because the evidence established that Gulf did not comply with

TIG's claims reporting procedure in a timely manner. We affirm the judgment in all respects.

## II. The Appeal from the Order Sustaining the Demurrer as to the Implied Covenant Claim

### A. *The Pleadings*

Gulf's appeal concerns the cause of action for breach of the implied covenant of good faith and fair dealing in the original complaint, which was brought against TIG and American International Specialty Lines Insurance, on December 9, 1997. In reviewing the dismissal, all well-pleaded factual allegations must be assumed as true. (*Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 495-496 [93 Cal.Rptr.2d 327, 993 P.2d 983]; *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967 [9 Cal.Rptr.2d 92, 831 P.2d 317]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) The complaint alleged the following facts. On November 2, 1994, Santa Susana entered into a contract with the county. Santa Susana agreed to construct and replace pipe culverts and other work on Las Flores Heights Road. On October 31, 1994, Gulf executed public works performance and payment bonds No. GE5645108 for Santa Susana as principal and the county as obligee. During the course of the construction work, Santa Susana damaged adjacent real property belonging to Louis E. Hill. The damage consisted of the erosion of a ditch backfilled by Santa Susana, which washed out retaining walls, a greenhouse, and an access road located on the Mr. Hill's property.

On March 15, 1996, the county declared Santa Susana in default under the construction contract. The county demanded that Gulf perform Santa Susana's remaining obligations under its October 31, 1994, performance bond. It was alleged that the remaining obligations, as required by the county, included the repair and restoration of the damage caused to Mr. Hill's property. Gulf retained Dorfman Construction (Dorfman) to complete Santa Susana's contractual obligations.

It was alleged that, at times pertinent to this action, Santa Susana maintained commercial general liability insurance written by TIG. It was further alleged that the insurance was primary and covered the type of loss or damage to Mr. Hill's property and the county was an additional insured under the policy. In addition, Gulf's performance bond was not a commercial general liability policy and was not intended to cover the type of damage done to Mr. Hill's property. In January 1997, Gulf paid Dorfman the sum of $46,793 to repair and restore the damage caused to Mr. Hill's property,

which had been caused by Santa Susana. As a result of the payment to Dorfman, Gulf, it was alleged, became subrogated to Santa Susana's and the county's rights as insureds under the TIG policy. Gulf alleged that TIG: failed to undertake the necessary repairs or to reimburse it; delayed in acknowledging the claim; refused to provide a copy of the policy; refused to conduct any investigation; requested documentation that had already been provided; refused to accept or deny coverage within a reasonable amount of time; refused to provide reasons for denying coverage; and failed to provide information upon request. Gulf asserted causes of action for: contract breach (first); declaratory relief (second); and breach of implied covenant of good faith and fair dealing (third).

On March 6, 1998, TIG filed a demurrer to the causes of action for breach of contract and of the implied covenant of good faith.[1] The only issue raised on appeal relates to the third cause of action in the original complaint for breach of the implied covenant of good faith and fair dealing. TIG argued that Gulf lacked standing to pursue the contract breach causes of action because: (1) TIG had no contractual relationship with Gulf; (2) Gulf did not qualify as a third party beneficiary under the law; and (3) as a noncontracting party, Gulf could not pursue claims for tort and punitive damages in what was essentially an action for equitable indemnity or contribution. TIG further argued that the Gulf's remedy was in equity and not tort. Accordingly, TIG argued relief including punitive damages claims and attorney fees under *Brandt v. Superior Court* (1985) 37 Cal.3d 813, 816-820 [210 Cal.Rptr. 211, 693 P.2d 796] were not recoverable by Gulf, a third party.

Gulf opposed the demurrer on the ground that it was subrogated to the rights of Santa Susana, which was a TIG policyholder and to those rights of the county as an additional insured. Gulf argued that, as a subrogee or assignee of Santa Susana, it possessed an insured's right to state causes of action for breach of contract and of the implied covenant of good faith and fair dealing.

In reply, TIG argued that Gulf was only an equitable subrogee, not a first party to any insurance contract with TIG and, as such, was only entitled to assignable rights. It was further argued: the complaint did not allege an assignment of rights; the right to punitive damages was personal and not assignable under California law; the cause of action for breach of the covenant of good faith and fair dealing was personal and was not assigned to Gulf; and Gulf and TIG were not in privity of contract.

The trial court sustained the demurrers with leave to amend. Gulf amended the complaint to allege causes of action for declaratory relief

---

[1] TIG conceded that the declaratory relief (second) cause of action was appropriate.

(first), equitable indemnity (second), and contribution (third). These three causes of action in the first amended complaint were the subject of a trial, judgment, and the cross-appeal.

### B. *The Demurrer to the Implied Covenant Claim in the Original Complaint Was Properly Sustained*

■ Gulf argues on the appeal that the trial court erred in sustaining the demurrer to its claim for breach of the implied covenant of good faith and fair dealing in the third cause of action in the original complaint.[2] ■ An appellate court's " 'only task in reviewing a ruling on a demurrer is to determine whether the complaint states a cause of action.' " (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 300 [58 Cal.Rptr.2d 855, 926 P.2d 1042]; *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479].) The reviewing court assumes the truth of allegations in the complaint which have been properly pleaded and gives it a reasonable interpretation by reading it as a whole and with all its parts in their context. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 558 [71 Cal.Rptr.2d 731, 950 P.2d 1086]; *People ex rel. Lungren v. Superior Court, supra,* 14 Cal.4th at pp. 300-301; *Aubry v. Tri-City Hospital Dist., supra,* 2 Cal.4th at pp. 966-967.) However, the assumption of truth does not apply to contentions, deductions, or conclusions of law and fact. (*Moore v. Regents of University of California, supra,* 51 Cal.3d at p. 125.) Furthermore, any allegations that are contrary to the law or to a fact of which judicial notice may be taken will be treated as a nullity. (*Interinsurance Exchange v. Narula* (1995) 33 Cal.App.4th 1140, 1143 [39 Cal.Rptr.2d 752]; *Fundin v. Chicago Pneumatic Tool Co.* (1984) 152 Cal.App.3d 951, 955-956 [199 Cal.Rptr. 789].) ■ For the reasons stated below, we conclude the trial court did not err in sustaining the demurrer to Gulf's claim for bad faith.

As Gulf concedes in its opening brief, there is no authority which supports its claim that a surety may bring a bad faith action against a general liability carrier. Rather, Gulf asks us to extrapolate from other general insurance law principles to conclude that a surety can plead a cause of action against a commercial general liability "carrier for breach of the covenant of good faith and fair dealing implied in every insurance contract, including claims for punitive damages and attorney fees. . . ." The general rule is that parties

---

[2]The trial court also sustained a demurrer to the cause of action for contract breach. Although Gulf's notice of appeal lists the contract breach claim, it has not argued on appeal that the trial court erred with respect to this cause of action. Gulf is deemed to have abandoned any arguments on this issue. (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1994) 21 Cal.App.4th 1586, 1595, fn. 8 [26 Cal.Rptr.2d 762]; *Elster v. Friedman* (1989) 211 Cal.App.3d 1439, 1440-1441, fn. 1 [260 Cal.Rptr. 148].)

who are not entitled to benefits under the policy cannot maintain a cause of action for an implied covenant. (*Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937, 944 [132 Cal.Rptr. 424, 553 P.2d 584]; see also *Coleman v. Gulf Ins. Group* 1986) 41 Cal.3d 782, 794-795 [226 Cal.Rptr. 90, 718 P.2d 77, 62 A.L.R.4th 1083]; *Seretti v. Superior Nat. Ins. Co.* (1999) 71 Cal.App.4th 920, 928-929 [84 Cal.Rptr.2d 315].) As the Supreme Court explained in *Murphy v. Allstate Ins. Co., supra,* 17 Cal.3d at page 944, "A third party should not be permitted to enforce covenants made not for his benefit, but rather for others. . . ." Claims for bad faith violation of an insurance contract are "strictly tied" to an implied covenant of good faith and fair dealing, which arises out of an underlying contractual relationship. (*Seretti v. Superior Nat. Ins. Co., supra,* 71 Cal.App.4th at p. 929; *Austero v. National Cas. Co.* (1976) 62 Cal.App.3d 511, 516-517 [133 Cal.Rptr. 107].) In the absence of such a relationship, no recovery for bad faith may be had. (*Seretti v. Superior Nat. Ins. Co., supra,* 71 Cal.App.4th at p. 929; *Austero v. National Cas. Co., supra,* 62 Cal.App.3d at pp. 516-517.) Accordingly, the insurer's duty of good faith and fair dealing is owed only to its insured and any express beneficiary of the policy. (*Seretti v. Superior Nat. Ins. Co., supra,* 71 Cal.App.4th at p. 929; *Austero v. National Cas. Co., supra,* 62 Cal.App.3d at p. 517.) There is no contractual relationship between Gulf and TIG. In the absence of a contractual relationship, no implied covenant claims may be stated. (*Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra,* 21 Cal.App.4th at p. 1598; *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1153 [271 Cal.Rptr. 246]; see *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 576 [108 Cal.Rptr. 480, 510 P.2d 1032].)

Gulf nevertheless claims that it was entitled to pursue claims against TIG for bad faith under a subrogation theory because as a subrogee, it possessed all of Santa Susana's rights. As noted previously, Santa Susana was an insured under a commercial general liability policy issued by TIG. TIG asserts the implied covenant claims were more properly characterized as causes of action for contribution or indemnification. The Court of Appeal in *Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1291-1293 [77 Cal.Rptr.2d 296], explained the concepts and confusion surrounding the theories of subrogation and contribution at length as follows: "As one California appellate court has opined, '[i]t is hard to imagine another set of legal terms with more soporific effect than indemnity, subrogation, contribution, co-obligation and joint tortfeasorship.' [Citation.] It is also difficult to think of two legal concepts that have caused more confusion and headache for both courts and litigants than have contribution and subrogation. [Citation.] ■ Although the concepts of contribution and subrogation are both equitable in nature, they are nevertheless distinct. [Citations.] [¶] Subrogation is defined as the substitution of another person

in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim. By undertaking to indemnify or pay the principal debtor's obligation to the creditor or claimant, the 'subrogee' is equitably *subrogated* to the claimant (or 'subrogor'), and succeeds the subrogor's rights against the obligor. [Citation.] In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid. [Citations.] ' "As now applied [the doctrine of equitable subrogation] is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." [Citations.]' [Citation.] [¶] . . . [¶] The right of subrogation is purely derivative. An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured. The subrogated insurer is said to ' "stand in the shoes" ' of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have. [Citations.]" (*Ibid.*, original italics, fn. omitted.) ■ The Court of Appeal continued: "Equitable contribution is entirely different. It is the right to recover, not from the party *primarily* liable for the loss, but from a *co-obligor* who *shares* such liability with the party seeking contribution. In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others. Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured. Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others. [Citations.]" (*Id.* at pp. 1293-1294, original italics, fn. omitted.) ■ Here, the record shows that Gulf, the surety on the performance bond for completion of the contract, and TIG, the commercial general liability carrier, were not obligated to indemnify or defend the same loss. Thus, Gulf has properly asserted that this case was more properly characterized as one for equitable subrogation.

However, Gulf has incorrectly asserted that its complaint alleged a cause of action for breach of the covenant of good faith and fair dealing under the theory that as the surety it was equitably subrogated to the rights of the insured. ■ An insurer's cause of action for equitable subrogation contains six elements: (1) the insured has suffered a loss for which the party to be charged is liable; (2) the insurer has compensated for the loss; (3) the insured has existing, assignable causes of action against the party to be charged, which the insured could have pursued had the insurer not compensated the loss; (4) the insurer has suffered damages caused by the act or omission which triggers the liability of the party to be charged; (5) justice requires that the loss be shifted entirely from the insurer to the party to be charged; and (6) the insurer's damages are in a stated sum, which is usually the amount paid to the insured, assuming the payment was not voluntary and was reasonable. (*State Farm Fire & Casualty Co. v. East Bay Municipal Utility Dist.* (1997) 53 Cal.App.4th 769, 774 [62 Cal.Rptr.2d 72]; *Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra,* 21 Cal.App.4th at p. 1596.) Equitable subrogation permits a party who has been required to satisfy the loss created by a party's wrongful act to "stand in the shoes" of the injured party and pursue the wrongdoer. ■ Here, there is simply no allegation that the insured was injured by any conduct for which TIG was liable and that Gulf paid. As the court in *Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra,* 21 Cal.App.4th at page 1596, stated: "In the insurance context, the doctrine permits the paying insurer to be placed in the shoes of the insured and to pursue recovery from third parties responsible to the insured for the *loss* for which the insurer was liable and paid. [Citation.]" (Italics added.) Here, there is no allegation concerning any conduct which resulted in an injury to the insured for which Gulf paid such that TIG should be held liable. Gulf allegedly paid a claim for the property damage to Mr. Hill's property. However, there is no indication that there was an amount in excess of that claim for which the insured was liable and for which Gulf paid. In other words, Gulf could not pursue claims that it was equitably subrogated to the insured's rights for bad faith against TIG. This is because TIG's alleged wrongful conduct did not result in any injury to the insured. (*Id.* at pp. 1597-1599, 1602-1603.)

For that reason, we disagree with Gulf that it may pursue the breach of the covenant claim under the authority of *Commercial Union Assurance Companies v. Safeway Stores, Inc.* (1980) 26 Cal.3d 912, 917-918 [164 Cal.Rptr. 709, 610 P.2d 1038] and *Northwestern Mut. Ins. Co. v. Farmers' Ins. Group* (1978) 76 Cal.App.3d 1031, 1040, 1049-1050 [143 Cal.Rptr. 415]. There is a critical distinction between *Commercial Union* and *Northwestern Mutual* and this case. In *Commercial Union* and *Northwestern Mutual* the bad faith of the insurers had caused a judgment against the insured for an amount in

excess of the relevant policies. In these cases, which involved equitable subrogation between primary and excess carriers, recovery for breach of the implied covenant was allowed because the wrongful refusal to settle had caused judgments in excess of policy limits against the insured; i.e., the insured was damaged. (*Commercial Union Assurance Companies v. Safeway Store, Inc., supra,* at pp. 917-918; *Northwestern Mut. Ins. Co. v. Farmers' Ins. Group, supra,* at pp. 1040, 1049-1050.) In other words, the insured suffered *damages* because of a failure to settle. Here, there is no allegation that the insurer's bad faith resulted in any injury to the insured. The only basis for Gulf's claim for breach of the covenant of good faith and fair dealing is through equitable subrogation to the rights of the insured. There are no allegations the insured, Santa Susana, was injured by TIG's conduct. Hence, the trial court properly sustained the demurrer to Gulf's breach of the implied covenant claim.

For similar reasons, we disagree with Gulf's contention that it has achieved the status of "a third party beneficiary of the insurance contract by virtue of being subrogated to the rights of the County of Los Angeles, the general contractor and the obligee on Gulf's performance bond, and an additional insured under the TIG policy." (See also *Hand v. Farmers Ins. Exchange* (1994) 23 Cal.App.4th 1847, 1857-1861 [29 Cal.Rptr.2d 258] [judgment creditor seeking to recover under policy pursuant to Insurance Code section 11580 permitted to allege bad faith claim against insurer as third party beneficiary of policy]; cf. *Hughes v. Mid-Century Ins. Co.* (1995) 38 Cal.App.4th 1176, 1183-1185 [45 Cal.Rptr.2d 302] [judgment creditor was not entitled to third party beneficiary status and rights under the policy to bring bad faith claim because action was brought before time for appeal of judgment expired and was not final].) Gulf is not a judgment creditor of the insured, Santa Susana, or the county as an additional insured. There was no allegation that either Santa Susana or the county were sued and that Gulf was required to pay a judgment against either party. Accordingly, Gulf has not achieved the status of a third party beneficiary of the insurance policy issued by TIG to Santa Susana and the county.

III. THE CROSS-APPEAL FROM THE JUDGMENT AFTER THE COURT TRIAL

A. *The Trial*

The matter proceeded to a court trial on the first amended complaint. The evidence produced at trial established the following facts. TIG issued liability insurance policy No. 91444-9309475 to Santa Susana. The policy was in effect from September 27, 1994, to September 27, 1995, when it expired. Section I of the policy provides that TIG agreed to provide coverage as

follows: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' sustained during the policy period up to the limit stated in the certificate, to which this insurance applies. The 'bodily injury' or 'property damage' must be caused by an 'occurrence'. The 'occurrence' must take place during the policy period and be the direct result of your operations conducted after the effective date of your certificate and within the 'coverage territory'. We will have the right and duty to defend any claim or 'suit' seeking those damages. We do not have any duty to defend any claim or 'suit' seeking damages for which we have determined there is no coverage. We may, at our discretion investigate any 'occurrence' and settle any covered claim or 'suit' that may result . . . : [¶] (2) This insurance applies to 'bodily injury' and 'property damage' only if claim for damages because of the 'bodily injury' or 'property damage' is first made in writing against any insured and reported to us in writing during the policy period or applicable extended reporting period for operations performed during the policy period."

Section V of the policy contained a mandatory reporting period as follows: "Any 'occurrence'/offense must be reported to us, in writing, within 60 days of the policy termination date. [¶] All claims made against any insured for an 'occurrence'/offense so reported to us within the 60 day period stated above, must be reported in writing to us within the policy period or one year after termination of the policy period. [¶] If any claim is made against any insured after 60 days following the policy termination date which arises out of an 'occurrence'/offense that was not reported in writing to us within 60 days of the policy termination date we will have no duty to defend or indemnify any insured for such claim." It is this reporting requirement which is at issue in the cross-appeal.

As noted above, the first amended complaint alleged that Gulf was entitled to recover from TIG the amount of damages paid to restore Mr. Hill's property. Gulf alleged it was entitled to recover pursuant to TIG's commercial liability policy. The controversy in the case centered around whether Gulf gave TIG timely notice of the claim within the required reporting period under Section V of the policy. The trial court implicitly determined that the claim was timely and entered judgment in Gulf's favor and against TIG in the amount of $43,593.

Although there was only one issue at trial, the facts surrounding the notice given the claim are somewhat complex because there are a number of entities, who are not parties to the action, but which were involved in the issuance of the TIG insurance policy and in the reporting procedures. We begin our analysis by listing the various entities involved in the transaction

as established by the evidence introduced at trial. The type of policy issued in this case was a part of an insurance program called the "CAIC." The CAIC insurance program catered to small general contractors, artisans, and contractors. Eve Insurance Brokerage (Eve) was the underwriting entity for the whole insurance program. Certified Bond and Insurance Services (Certified) was Santa Susana's insurance agent or broker in 1994 through 1996. Prior to September 27, 1994, Certified obtained insurance for Santa Susana under the CAIC program. The insurer was a captive company. The actual carriers were TIG and American International Specialty Lines Insurance Company (American). From September 1993 through September 1994 the actual carrier was American.

The following year the policy was renewed through the brokerage firm of Eve and TIG was the carrier. The effective dates under the TIG policy were from September 27, 1994, through September 27, 1995. The underwriting forms were supplied to Certified by its wholesaler Pledge International Insurance Brokers (Pledge) or Pinnacle Insurance Services (Pinnacle). This company was known as Pledge or Pinnacle throughout the relevant time periods. Hereinafter, the company is referred to as Pinnacle for purposes of clarity. Pinnacle had received the underwriting forms from Eve which produced and distributed the forms to all the different wholesalers. After completing the forms for Santa Susana, the insured, Certified transmitted them back to Pinnacle. As noted previously, Certified was the insurance agent for Santa Susana. Thereupon, Pinnacle communicated the premium and confirmed the coverage for the TIG policy. Apparently, at the time of the renewal process, Eve was still operating the insurance program. Nonetheless, the program was changing carriers. The wholesalers did not know who would be the ultimate carrier. Eve initially indicated the carrier would be American. Later, Eve determined that TIG would be the carrier. When Pinnacle communicated the uncertainty of the carrier, Certified initially prepared the certificate of insurance and listed two insurance companies as providing coverage, American and Golden Eagle Insurance Company. This certificate shows Certified as the producer and names the county as an additional insured. When the policy was actually issued to Santa Susana by TIG, Pinnacle was listed as the "account exec" and as the "account broker." The certificate of insurance lists Pledge as the producer.

At the trial, Lynda Schultz testified that she was employed by Insurance Services Group, LLC, which was the claims management company for Gulf on various bonds. Insurances Services Group was previously known as Viceroy Management and for a short time as Viceroy, Inc. Since 1994, either Viceroy or Insurance Services Group was the managing claims agent for Gulf. Viceroy investigated the claim at issue.

On August 27, 1996, Viceroy sent a letter to American in care of Certified regarding the county's claims against Santa Susana for the damage to Mr. Hill's property. The letter was sent to American based on an investigation by Viceroy which revealed the aforementioned insurance certificate naming the insured as Arthur V. Lugue, Santa Susana Construction Company with a policy period of September 27, 1994, to September 27, 1995. The certificate indicated the county was an additional insured. As noted previously, this certificate also identified Certified as the producer and the companies affording coverages as American and Golden Eagle Insurance Company. Certified's address was the only one listed on the certificate.

On August 31, 1996, Certified received Viceroy's letter. On September 11, 1996, Certified filled out a general liability notice and transmitted the notice and the Viceroy letter to Pinnacle, as the wholesaler. Certified had previously sent notices of other policy claims for Santa Susana, like the August 27, 1996, claim, to Pinnacle. The September 11, 1996, notice to Pinnacle fell within the September 27, 1996, one-year policy reporting period.

On October 3, 1996, Pinnacle transmitted the Viceroy claim letter and general liability notice, which had been prepared by Certified to Loss Management Professionals, Inc. (LMPI). LMPI was a third party claims administrator for TIG. LMPI's claims file contains a "Claim Data Sheet" which listed TIG as the carrier and the producer as KIGACA, which is another name for Pinnacle. A notation at the bottom of the document states: "Comments/Instructions": "Modified Occ policy DOL 4/4/95, Reported 9-11-96." There is also a document in LMPI's claims file which contains a "Claim File Activity Log" entry for October 14, 1996. It provides it was entered by "N. Meyers" and states: "Reviewed the new loss, loss date 4-4-95, reported 9/11/96. [¶] Its policy effective dates, 9/27/94 to 9/27/95 modified occ policy- [¶] Does not appear there will be any coverage as the loss was not reported within the 1 yr. reporting period."

Further, Certified's owner, Jason Turner,[3] testified as to the renewal of the policy for Santa Susana. Mr. Turner testified that Certified had no direct access to Eve, TIG, or LMPI in obtaining the renewal. Certified dealt with Pinnacle for the CAIC program through which the TIG policy was issued. Certified filled out forms and forwarded them to Pinnacle, which confirmed the coverage and communicated the premium charge for the TIG policy. Pinnacle was listed in certificates of insurance as the "account exec" and "account broker" in the TIG renewal policy issued to Santa Susana. The TIG policy did not specify to whom claims should be reported. Moreover, Mr.

---

[3]Mr. Turner is not related to the author of this opinion.

Turner, Certified's owner, testified that he had forwarded this claim as well as others under the TIG policy to Pinnacle. LMPI accepted and acknowledged the claims made against the TIG policy. There was never any indication from LMPI or TIG that Pinnacle, which was listed in the certificate of insurance forms, was improperly holding itself out to the public to act on the insurer's behalf. Neither LMPI nor TIG indicated that the claims should not be reported through Pinnacle. Further, neither LMPI nor TIG indicated that the method of reporting the claims was unacceptable.

The parties vigorously disputed whether the notices which had been served on Pinnacle and LMPI between September 11, 1996, and October 3, 1996, complied with the TIG policy reporting requirements. TIG's theory was that notice of the claim on Pinnacle was insufficient. TIG argues that Pinnacle was not its agent. Gulf, of course, disputed this contention. At the conclusion of the trial, the court determined that the claim was timely and entered judgment in Gulf's favor and against TIG in the amount of $43,593, plus costs on August 3, 1999. Notice of entry of judgment was served by mail on August 5, 1999. Gulf filed a notice of appeal on September 29, 1999. TIG filed its notice of cross-appeal on October 8, 1999.

B. *The Cross-appeal Is Timely*

Gulf argues the cross-appeal from the final judgment must be dismissed because it is untimely. The timely filing of a notice of appeal or cross-appeal is jurisdictional. (*Green Trees Enterprises, Inc. v. Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 787 [59 Cal.Rptr. 141, 427 P.2d 805]; *Santa Clara County Dist. Attorney Investigators Assn. v. County of Santa Clara* (1975) 51 Cal.App.3d 255, 263 [124 Cal.Rptr. 115]; *Kapelus v. United Title Guaranty Co.* (1971) 15 Cal.App.3d 648, 651 [93 Cal.Rptr. 278].) California Rules of Court,[4] rule 3(c) provides in pertinent part: "When a timely notice of appeal is filed under subdivision (a) of rule 2 or under subdivision (a) or (b) of rule 3, any other party may file a notice of appeal within 20 days after mailing of notification by the superior court clerk of such first appeal or within the time otherwise prescribed by the applicable subdivision, whichever period last expires. . . ."

Rule 3(a) and (b) applies to motions for a new trial and to vacate which are inapplicable to this case since neither request was made by either party. The time specified for bringing an appeal in rule 2(a) is as follows: "Except as otherwise provided by Code of Civil Procedure section 870 or other statute or rule 3, a notice of appeal from a judgment shall be filed on or before the earliest of the following dates: (1) 60 days after the date of

---

[4]All references to rules are to the California Rules of Court.

mailing of the clerk of the court of a document entitled 'notice of entry' of judgment; (2) 60 days after the date of service of a document entitled 'notice of entry' of judgment by any party upon the party filing the notice of appeal, or by the party filing the notice of appeal; or (3) 180 days after the date of entry of the judgment. For purposes of this subdivision, a file-stamped copy of the judgment may be used in place of the document entitled 'notice of entry'."

Judgment was entered on August 3, 1999. On August 5, 1999, Gulf served a notice of entry of judgment by mail. Gulf filed a notice of appeal on September 29, 1999. The notice of cross-appeal was filed on October 8, 1999, which was 63 days after service of the notice of entry of judgment. However, under rule 3(c) when a timely notice of appeal is filed by a party, the other side must file notice of its cross-appeal within the longer of the two time periods. The first time period is 20 days after the court clerk mails notice of the filing of the first appeal. The second period is the normal time prescribed for filing the notice of appeal. (*Kapelus v. United Title Guaranty Co., supra,* 15 Cal.App.3d at p. 651, fn. 2; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2000) ¶ 3:100, p. 3-36.) We take judicial notice of the record on appeal which contains a "Notice to Attorney In Re Notice of Appeal" filed on September 30, 1999. (Evid. Code §§ 452 & 459; rule 3(c).) That document states that the clerk of the superior court mailed a written notification of the filing of the notice of appeal on September 30, 1999. Thus, the deadline for filing the cross-appeal was on October 20, 1999. Accordingly, the cross-appeal which was filed on October 8, 1999, is timely. (Rule 3(c).)

### C. *The Judgment Is Supported by Substantial Evidence*

 TIG argues in the cross-appeal that the trial court erred in rendering a judgment in favor of Gulf. TIG argues the construction claim was not reported to it within the one-year reporting deadline in the policy. The controversy, thus, centers on whether TIG can be held accountable for the notice that was served on Pinnacle and forwarded to LMPI sometime between September 11, 1996, and October 3, 1996.

The issue litigated in the trial court was whether Pinnacle acted as TIG's agent. If so, service of the claim on Pinnacle was sufficient. TIG argues that there is no evidence to support an actual agency relationship between it and Pinnacle. Gulf counters that the evidence is sufficient to establish ostensible agency which is statutorily defined as follows, "Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." (Civ. Code, § 2316.) Civil Code section 2317 states, "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third

person to believe the agent to possess." The Court of Appeal has synthesized the law as follows: "To establish ostensible authority in an agent, it must be shown the principal, intentionally or by want of ordinary care has caused or allowed a third person to believe the agent possesses such authority. (Civ. Code, § 2317; *Hill* v. *Citizens Nat. Trust & Sav. [Bank]* (1937) 9 Cal.2d 172, 176 [69 P.2d 853].) [¶] . . . [¶] ██ Ostensible authority must be established through the acts or declarations of the principal and not the acts or declarations of the agent. (*People* v. *Surety Ins. Inc.* (1982) 136 Cal.App.3d 556, 562 [186 Cal.Rptr. 385].) However, the doctrine of ostensible authority extends to subagents; hence the principal is similarly liable to third persons for representations made by subagents. (*Hartong* v. *Partake* (1968) 266 Cal.App.2d 942, 963 [72 Cal.Rptr. 722].) Also, where the principal knows that the agent holds himself out as clothed with certain authority, and remains silent, such conduct on the part of the principal may give rise to liability. (*Leavens* v. *Pinkham & McKevitt* (1912) 164 Cal. 242, 247-248 [128 P. 399].)" (*Preis v. American Indemnity Co.* (1990) 220 Cal.App.3d 752, 761 [269 Cal.Rptr. 617].)

██ The issue of whether Pinnacle was acting as an agent of TIG in accepting claims is a question of fact. (*Boquilon v. Beckwith* (1996) 49 Cal.App.4th 1697, 1719-1720 [57 Cal.Rptr.2d 503]; *Preis v. American Indemnity Co., supra,* 220 Cal.App.3d at pp. 761-762.) We must accept the trial court's findings on agency as conclusive if supported by substantial evidence, whether contradicted or uncontradicted. (*Boquilon v. Beckwith, supra,* 49 Cal.App.4th at pp. 1719-1720; *Inglewood Teachers Assn. v. Public Employment Relations Bd.* (1991) 227 Cal.App.3d 767, 781 [278 Cal.Rptr. 228].) We conclude that there was substantial evidence to support the finding that Pinnacle was acting as TIG's ostensible agent.

Mr. Turner and Ms. Schultz testified as to the manner in which Pinnacle processed claims for TIG. Their testimony constituted substantial evidence. Under such circumstances, we must uphold the trial court's determination that Pinnacle was an ostensible agent of TIG because it is supported by substantial evidence.

### DISPOSITION

The judgment is affirmed in all respects. Each party to bear its own costs on appeal.

Grignon, J., and Godoy Perez, J., concurred.