Filed 9/29/22  Star Restoration v. Salame CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| STAR RESTORATION, INC. | B310809 |
| Plaintiff and Respondent, | (Consolidated with B313512) |
| v. | (Los Angeles County Super. Ct. No. BC576275) |
| FRANK SALAME, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven J. Kleifeld, Judge. Affirmed.

Law Office of Jim P. Mahacek and Jim P. Mahacek for Defendant and Appellant.

Watkins & Letofsky and Michael F. Long for Plaintiff and Respondent.

* * * * * *

When a homeowner working abroad got word that something in his vacant house was leaking, he asked a friend to "take care of it." The friend hired a contractor, who repaired the substantial structural and mold-related damage caused by the leak. When the homeowner refused to pay the $40,000 bill, the contractor sued and the trial court awarded the contractor damages, prejudgment interest, and attorney fees. The homeowner appeals on a plethora of grounds. None of them has merit, so we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts[1]

Frank Salame (defendant) owns a home in Pomona, California, but spends 11 months out of the year in Lebanon working as an engineer on building projects.

In late June 2014, defendant's homeowner's association sent a letter notifying him that an unknown liquid was leaking out from beneath the garage door of his home. Because he was in Lebanon, defendant asked his friend Antoinette Auon (Auon), to whom defendant had already given a key to the house, to "take care of" the problem.

---

[1] We draw these facts from the settled statement originally submitted by the homeowner in this case, but consistent with the substantial evidence standard of review, set forth those facts in the light most favorable to the judgment.

2

In mid-July 2014, Aoun reached out to Tannous Abi-Najm (Tony),[2] who grew up with Aoun's husband. Tony was a building contractor who ran Star Restoration, Inc. (Star). Aoun let defendant know she "had a contractor looking at the house."

Tony's initial inspection revealed that the reverse osmosis filter under the kitchen sink had sprung a leak, and that the leak—gone unaddressed for months in the unoccupied house—had seeped out the kitchen cabinets, through the kitchen flooring to the ceiling of the garage below, down the garage walls, and beneath the garage door; the moisture had caused mold to bloom throughout the house.

On July 17, 2014, defendant instructed his insurance company that Auon had "full power of attorney to handle" his claim of "deadly mold."

Two days later, on July 19, 2014, Aoun signed two interrelated contracts—entitled "Work Authorization Agreement" and "Replacement Authorization" (collectively, the Star contracts)—authorizing Star to repair the damage to defendant's home. Specifically, the Replacement Authorization authorized Star to "make the necessary restoration and repairs to the damaged contents and damaged structure . . . in order to achieve the pre-damaged condition of [the] property." The Work Authorization Agreement explained that the cost of repairs would be a function of the cost of materials (using "standard prices . . . based on the national contractor and remodeling blue book costs"), the cost of labor (with various labor rates specified), plus a "minimum" 10 percent "profit" and 10 percent "overhead"; that Star was entitled to the full amount of these costs, even if

---

[2]     To avoid confusion, we adopt the parties' and the trial court's usage of his first name; we mean no disrespect.

3

insurance did not cover them; that any "unpaid balance" would accrue interest at a rate of "1.5% . . . per month"; and that Star was entitled to "attorney fees" should collection efforts be necessary. Aoun signed both contracts, and signed the Replacement Authorization with her name *and* the initials "P.O.W." (presumably short for *pow*er of attorney).

Star got to work. It took two months—August and September 2014—to finish. Tony paid $480 for a plumber to remove the reverse osmosis water filter that sprung the leak, paid $1,160 for a mold assessment that reported "elevated" levels of mold in defendant's home, and paid $10,690 for demolition of the damaged areas and removal of the mold from defendant's home. Then and only then did Tony proceed with the restoration work, which included "framing, sheetrock, plaster, painting, tile floor in the kitchen, some kitchen cabinets, countertop, and sink."

Tony and defendant exchanged text messages in September and November 2014. In September, Tony asked defendant about his insurance policy, and defendant directed Aoun to send Tony a copy of the policy. In November, defendant directed Tony to "finish the job," although Tony reminded defendant that "the job" was completed back in September.

Star presented defendant a bill for $42,360.62 for the restoration and repair—which included Star's work as well as the mold remediation work done by the third parties. Defendant offered Star $28,000, the amount his insurance company had given him. Tony refused that amount, and defendant kept the insurance money for himself

## II. Procedural Background

In March 2015, Star sued defendant and Aoun for the unpaid balance of $42,350.35, as well as attorney fees, under

theories of (1) breach of contract, (2) intentional misrepresentation, (3) negligent misrepresentation, and (4) conversion. Defendant filed a cross-complaint alleging that he was damaged because Star installed, without his authorization, cabinets, countertops, and other finishes that did not align with his aesthetic vision for the kitchen.

After a two-day bench trial in March 2020, the trial court issued a statement of decision ruling that defendant owed Star $35,360.62 as well as prejudgment interest at the 1.5 percent monthly rate set forth in the Work Authorization Agreement. Specifically, the court determined that (1) the Star contracts were binding on defendant (but not on Aoun) because Aoun was defendant's "actual" agent, because she was his "ostensible" agent, and because defendant had subsequently ratified the Star contracts; (2) defendant breached the contracts, although Star was not entitled to the amounts spent to replace the counters, sink, and flooring (which came to $7,000) because Aoun's powers as an agent did not encompass making aesthetic choices associated with those items; and (3) the Star contracts were not void merely because they lacked all the disclosures required by Business and Professions Code section 7159 for "home improvement" contracts.

After the trial court entered judgment, Star moved to recover its attorney fees as permitted by the contracts. The court ultimately awarded $132,290 in attorney fees, and entered an amended judgment in the amount of $212,504.09 consisting of $35,360.62 in damages, $36,375.91 in prejudgment interest, $5,926.49 in costs, and $132,290 in attorney fees.

Defendant timely appealed both the judgment and amended judgment, and this court consolidated the appeals.

5

## DISCUSSION

On appeal, defendant levels three categories of attacks on the judgments below: (1) the Star contracts are not enforceable against him, (2) Star's damages are too speculative, and (3) Star is not entitled to prejudgment interest.

## I.     Enforceability of the Star Contracts

Defendant contends that he cannot be liable for breach of the Star contracts because (1) Auon was not acting as his agent when she signed those contracts; (2) the contracts are too uncertain to be enforceable; and (3) the contracts are void for violating Business and Professions Code section 7159.  Each of these contentions lacks merit.[3]

### A.     *Agency*

The trial court found that Aoun was defendant's actual agent.

This is a factual finding we review for substantial evidence. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*) ["In reviewing a judgment based upon a statement of decision following a bench trial, . . . [w]e apply a substantial evidence standard of review to the trial court's findings of fact."].)  That is, we "examin[e] the whole record, including conflicting evidence, in the light most favorable to the ruling below to determine whether there is reasonable, credible evidence of solid value to support that ruling." (*Ferguson v. Yaspan* (2014) 233 Cal.App.4th 676, 682.)  "'Substantial evidence includes circumstantial evidence

---

[3]     Because we affirm the judgment on Star's breach of contract claim, we need not address defendant's alternative arguments that the judgment cannot be affirmed on an unpled quantum meruit theory.

6

and any reasonable inferences drawn from that evidence.'" (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

"An agency is actual when the agent is really employed by the principal." (Civ. Code, § 2299.) An "actual" agency relationship is a product of "'bilateral'" "'"consent"'": The principal "'must in some manner indicate that the agent is to act for him, and the agent must act . . . on his behalf.'" (*Van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 571, quoting *Edwards v. Freeman* (1949) 34 Cal.2d 589, 592; *Tomerlin v. Canadian Indem. Co.* (1964) 61 Cal.2d 638, 643.) "'An agent's authority may be proved by circumstantial evidence.'" (*Tomerlin*, at p. 644.)

Substantial evidence supports the trial court's factual finding that Aoun was defendant's actual agent. More specifically, substantial evidence supports the finding that defendant consented to having Aoun serve as his agent because (1) defendant instructed his insurance company on July 17, 2014, that Aoun had "full power of attorney to handle" his claim of "deadly mold," from which we can reasonably (and, indeed, necessarily) infer that defendant empowered Aoun to hire a contractor to repair the damage in the first place (because there would be no insurance claim for the damage unless someone was hired to repair the damage) (see Civ. Code, § 2319, subd. (1) [agent has authority "[t]o do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of [her] agency"]); (2) defendant's communications with Tony in September and November 2014 indicated no surprise regarding Star's work and, indeed, indicated that defendant wanted Star to "finish the job," from which we can reasonably infer that defendant had authorized Aoun to hire Star to do "the

7

job" in the first place (e.g., *Golf Ins. Co. v. TIG Ins. Co.* (2001) 86 Cal.App.4th 422, 439 ["where the principal knows that the agent holds himself out as clothed with certain authority, and remains silent, such conduct on the part of the principal may give rise to liability"]); and (3) defendant's mid-July instruction to Aoun to "take care of" the leak problem with his house.

Defendant raises four categories of arguments in response.

First, he argues that *the trial court's* reasons for finding that Aoun was his actual agent—namely, that she had a key to his house but still needed defendant's permission to allow Tony to enter the house, that she forwarded the insurance policy to Tony, and that she told Tony to deal directly with the insurance company—do not amount to substantial evidence of actual agency. Because we have concluded that the three items of evidence we detail above constitute substantial evidence in support of a finding of actual agency, we need not consider the trial court's reasoning. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [we review a trial court's ruling, not its rationale].)

Second, defendant argues that many of *our* reasons for finding sufficient evidence of actual agency are deficient. He argues that we may not rely *solely* on Aoun's testimony that defendant told her to "take care of [it]" because actual agency cannot be proven solely by the unsworn statement of the alleged agent made outside the alleged principal's presence. (*Dill v. Berquist Construction Co.* (1994) 24 Cal.App.4th 1426, 1437; *Bowser v. Ford Motor Co.* (2022) 78 Cal.App.5th 587, 613; *Syar v. United States Fidelity & Guaranty* (1943) 51 Cal.App.2d 527, 531.) This argument lacks merit because we rely on two other items of evidence *in addition to* Aoun's statement; where such independent evidence of agency exists, we *may* rely on the agent's

8

statement as corroborative evidence of actual agency. (*Syar*, at p. 531-532; *Pacific States Sav. & Loan v. Stowell* (1935) 7 Cal.App.2d 280, 282.) Defendant also argues that the July 17, 2014 email defendant sent to his insurance company assigning Aoun "power of attorney" may not be considered because (a) it only grants Aoun a power of attorney *as to his insurer* (and not as to Star), and (b) that email was never formally admitted into evidence during the trial. These attacks also lack merit. As explained above, we may reasonably infer that defendant would authorize Aoun to act on his behalf with the insurance company only if he had also authorized Aoun to act on his behalf in hiring Star to fix the damage that would be reimbursed by the insurance company. And although the trial court did not formally admit the July 2014 email prior to its statement of decision, the court's citation to that email in that statement of decision necessarily means that it admitted the evidence; what is more, formal admission of the email is not necessary because defendant also testified at trial that he had granted Aoun his power of attorney with the insurance company.

Third, defendant points to several pieces of evidence that might support a finding that Aoun was *not* his agent—namely, that Tony never sent copies of the Star contracts to him; that Aoun's husband testified that Tony told Aoun that the Star contracts were "not real," and that Aoun was "not comfortable" signing one of the two Star contracts. But our job is not to assess whether the evidence might support a contrary conclusion if we were to reweigh the evidence; rather, our job is to assess whether the trial court's finding is supported by substantial evidence, and here it is. (*Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1033;

*People v. Brown* (2014) 59 Cal.4th 86, 106 ["[w]e do not reweigh evidence"].)

Lastly, defendant argues that Aoun cannot be his actual agent because she did it for free as part of their friendship. Because the prerequisite for actual agency is consent, not payment, this argument has no basis in law.

\*       \*       \*

Because we conclude that substantial evidence supports the trial court's finding of actual agency, we have no occasion to decide whether substantial evidence also supports its findings of ostensible agency and ratification.

## B.     *Vague and ambiguous*

A contract is valid only if its terms are "reasonably certain." (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811.) The terms of a contract are "reasonably certain" as long as they "provide a basis for determining the existence of a breach and for giving an appropriate remedy." (*Moncada v. West Coast Quartz Corp.* (2013) 221 Cal.App.4th 768, 777 (*Moncada*).) A contract that lacks reasonable certainty is "void and unenforceable." (*Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 481 (*Cal. Lettuce Growers*); Civ. Code, § 1598.) Because courts prefer to effectuate the parties' intent to contract rather than nullify it, courts disfavor holding contracts void due to uncertainty. (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1192.) Whether a contract's terms are certain enough to be enforceable is a question of law we review de novo. (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208-209; *ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266-1267.)

The Star contracts in this case are "reasonably certain." They provide a basis for determining the existence of a breach insofar as they obligate Star to "restore and/or replace" any damage to defendant's home to bring it to its "pre-damaged condition." And they provide a basis for determining the appropriate remedy because the contracts obligate defendant to pay for the cost of the restoration (even if it exceeds the amount covered by insurance) and sets forth the relevant components of that cost, including materials, labor, profit, and overhead. (Accord, *Moncada, supra,* 221 Cal.App.4th at pp. 777-779 [contract obligating defendant to provide a bonus sufficient to "enable you to retire" is reasonably certain].)

Defendant argues that the Star contracts are invalid because they do not list a specific dollar amount and they do not list the specific work Star will undertake. Neither is required. (*Cal. Lettuce Growers, supra,* 45 Cal.2d at p. 482 ["absence of price provisions does not render an otherwise valid contract void"]; *Sabatini v. Hensley* (1958) 161 Cal.App.2d 172, 175 ["It is not essential that the contract specify the amount of the consideration or the means of ascertaining it."].) Defendant also argues that Star ultimately did not charge the "bluebook" amount specified in the contract, but what Star did *afterwards* cannot bear on whether the contract was void for uncertainty *at the time it was signed.*

C.    *Compliance with Business and Professions Code section 7159*

Business and Professions Code section 7159 specifies the content that must be included in a "home improvement contract," including several mandatory disclosures and notices. (Bus. & Prof. Code, § 7159.) That statute also defines a "home

11

improvement contract" as "an agreement . . . between a contractor and an owner . . . for the performance of a home improvement . . . if the aggregate contract price . . . exceeds" $500. (Bus. & Prof. Code, § 7159, subd. (b).) The Code elsewhere defines the term "home improvement" broadly to mean "the repairing, remodeling, altering, converting, or modernizing of, or adding to, residential property, as well as the reconstruction, restoration, or rebuilding of a residential property that is damaged or destroyed by a natural disaster." (*Id.*, § 7151, subd. (a).)

We will assume for purposes of this appeal that the Star contracts are "home improvement contracts" subject to Business and Professions Code section 7159. It is undisputed that they do not *comply* with that provision: On their face, the Star contracts do not contain the required terms; the pertinent state agency came to the same conclusion, although it elected to give Star a warning rather than open an investigation.

But does this noncompliance mandate that the Star contracts are void?

It does not. Although a contract that does not comply with statutory mandates is presumptively void, where the contract is not otherwise illegal courts have the discretion to enforce the contract despite its noncompliance with a statute when (1) the party seeking to void the contract based on statutory noncompliance "do[es] not fall squarely into the class" that the statute was enacted to protect, and (2) that party will be "unjustly enriched" if the contract is voided. (*Asdourian v. Araj* (1985) 38 Cal.3d 276, 291-292; *Davenport & Co. v. Spieker* (1988) 197 Cal.App.3d 566, 570.) Notwithstanding defendant's insistence that he is an "unsophisticated" homeowner, it is

12

undisputed that he is an engineer with years of construction experience. He is accordingly not the type of "unsophisticated consumer" who might otherwise get swindled without the advisements made by Business and Professions Code section 7159. (*Asdourian*, at pp. 290, 292; *Davenport*, at p. 570; cf. *Hinerfeld-Ward, Inc. v. Lipian* (2010) 188 Cal.App.4th 86, 94 ["the sophistication of the parties in construction matters is only one of several factors"].) Further, voiding the Star contracts would grant defendant a double windfall: Not only would he keep the $28,000 payment from his insurer, but he also would retain the benefits bestowed by Star's repair work without ever compensating Star. (*Asdourian*, at pp. 293-294; *Davenport*, at pp. 570-571; *Hinerfeld-Ward*, at p. 95.)

## II. Damages

Defendant next contends that Star utterly failed to prove any damages for the breach of contract claim on which it prevailed. We review challenges to the trial court's factual findings for substantial evidence and to any subsidiary questions of law de novo. (*Thompson*, *supra*, 6 Cal.App.5th at p. 981.)

The measure of damages for a breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused [by the breach], or which, in the ordinary course of things, would be likely to result [from the breach]." (Civ. Code, § 3300; *Erlich v. Menezes* (1999) 21 Cal.4th 543, 550.) All that is required is "some reasonable basis [for] comput[ing]" those damages. (*Milton v. Hudson Sales Corp.* (1957) 152 Cal.App.2d 418, 434.) The party asserting a claim for breach of contract may still meet its burden of proof on damages even if those damages are not "susceptible to exact proof" or because there is some "uncertainty" as to the exact amount.

13

(*Copenbarger v. Morris Cerullo World Evangelism, Inc.* (2018) 29 Cal.App.5th 1, 10 ["The plaintiff in a breach of contract action has the burden of proving nonspeculative damages with reasonable certainty."]; *Cal. Lettuce Growers*, *supra*, 45 Cal.2d at pp. 486-487; cf. Civ. Code, § 3301 [breach-of-contract damages that "are not clearly ascertainable in both their nature and origin" are not recoverable].) Courts grant this leeway as a means of "put[ting] the injured party in as good a position as he or she would have been had performance been rendered as promised [in the contract]." (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 848; *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515.)

The damages awarded to Star satisfy this computational standard. Tony testified that the $42,360.62 in damages he sought was comprised of (1) the amount defendant's insurer estimated the damage at issue in his insurance claim would cost to repair, plus (2) the cost of the third-party vendors whom Star hired to repair the leak and conduct mold remediation. This is the amount that would "compensate [Star]," as "the party aggrieved" "for all the detriment proximately caused" by defendant's breach of his agreement to pay Star to restore his property to its "pre-damaged condition."

Defendant responds with two arguments.

First, he argues Star is entitled to *no* damages because its contracts did not specify any amount due. But the law does not require that an estimate be included in the contract itself; as explained above, it is enough if the damages can be reasonably calculated thereafter.

Second, defendant argues that Star did not present any evidence at trial substantiating its damages because it did not

14

introduce any of the invoices it subsequently created to delineate its bill.  Defendant's argument ignores that Tony testified to how he came to the $42,350.35 figure he sought as damages.  Relatedly, defendant seems to suggest that Tony's decision to peg Star's own damages (as opposed to those incurred by the third-party vendors) at the amount defendant's insurer estimated the work would cost means that the damages amount is too uncertain, particularly because there was no showing that the estimate corresponds with the "bluebook" costs the Star contracts said would be used to calculate the cost of materials.  We reject this suggestion.  As the owner of Star, Tony is able to assess the damage his company suffered by virtue of defendant's breach and the fact that the amount he calculated is the same as the estimate the insurer provided (and which is close to the amount the insurer eventually compensated defendant) does not nullify Tony's assessment.

## III.    Prejudgment Interest

Defendant lastly contends that the trial court erred in awarding Star prejudgment interest.

Where, as here, a plaintiff is "entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated," a trial court has the discretion to award the plaintiff "prejudgment interest" at the "legal rate of interest stipulated by [that] contract" back to "the date the action [for breach of contract] was filed."  (Civ. Code, §§ 3287, subd. (b), 3289, subd. (a).)  In evaluating the exercise of this discretion, we are guided by ""[t]he purpose of prejudgment interest,"" which is ""to compensate [the] plaintiff for [the] loss of use of his or her property.""  (*Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.* (2014) 231 Cal.App.4th 134, 198.)  The

15

trial court is to "determine whether an award of prejudgment interest is appropriate in light of the particular facts and circumstances in the case," and "'to balance the concern for fairness to the debtor against the concern for full compensation to the wronged party.'" (*Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726, 751-752.) Our review is for an abuse of this discretion. (*Id.*, at p. 752.)

The trial court did not abuse its discretion in awarding Star prejudgment interest at an annual rate of 18 percent (1.5 percent per month, times 12) back to the date Star filed its complaint on March 20, 2015. The award of prejudgment interest was appropriate, in the trial court's view, "because although [defendant] obtained the $28,000 of insurance [money], he withheld payment to Star of even that amount." Because defendant withheld money from Star that could otherwise have been in Star's bank account earning interest since before this lawsuit was filed, the trial court could reasonably conclude that an award of prejudgment interest would compensate Star for the loss of the money to which it was otherwise entitled. The rate of prejudgment interest was also appropriate, because it corresponds with the rate in the Star contracts.

Defendant challenges this analysis. He argues that prejudgment interest may only be awarded if the amount owed is a "sum certain." This is the rule that applies to cases not based on breach of contract under Civil Code section 3287, subdivision (a), but it is *not* the rule that applies to cases, like this one, "based upon a cause of action in contract" under subdivision (b). (See *Roodenburg v. Pavestone Co., L.P.* (2009) 171 Cal.App.4th 185, 191 [so holding]; cf. *Coughlin v. Blair* (1953) 41 Cal.2d 587, 604 [relying on version of Civil Code section 3287 before

16

subsection (b) was added]; see *Rifkin v. Achermann* (1996) 43 Cal.App.4th 391, 396 [statute amended in 1967 "to give the trial court discretionary authority to award prejudgment interest in contract actions"].) Defendant alternatively argues that the contractual interest rate of 1.5 percent—when calculated as an annual rate of 18 percent—exceeds the constitutional cap on usurious interest rates (Cal. Const., art. XV, § 1) and is therefore void. This argument lacks merit because the restriction on usurious interest rates only applies to "loans" and "forbearances"; it does not apply to the amount owed on outstanding balances for services rendered. (*Roodenburg*, at p. 194 [so holding].)

## DISPOSITION

The judgment and amended judgment are affirmed. Star is entitled to its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
HOFFSTADT


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ