Filed 7/31/14  Getsen Acquisitions v. Zapf CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GETSEN ACQUISITIONS, LLC, | D062874 |
| Cross-Complainant and Respondent, | |
| v. | (Super. Ct. No. 37-2011-00050599-CU-OR-NC) |
| ERIC ZAPF, | |
| Cross-Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert P. Dahlquist, Judge.  Affirmed.

Eric Zapf, in pro. per., for Cross-defendant and Appellant.

Andersen, Hilbert & Parker, David Michael Parker and Joseph A. LeVota, for Cross-complainant and Respondent Getsen Acquisitions, LLC.

I.

INTRODUCTION

Cross-defendant Eric Zapf appeals from a judgment entered against him and in favor of cross-complainant Getsen Acquisitions, LLC (Getsen) on Getsen's claim for professional negligence. Zapf was the real estate agent for the sellers of a residential property that Getsen purchased.

After Getsen purchased the property, it discovered that the property remained encumbered by a deed of trust in favor of a mortgage lender because the property owner's loan had not been paid off. It was ultimately determined that someone had signed and recorded fraudulent documents that made it appear that the seller's loan had been satisfied and that the trust deed in favor of the lender had been reconveyed to a third party, such that it appeared that the only lien on the property was for an amount substantially less than the amount truly owed by the sellers.

In litigation that involved a number of parties and multiple complaints and cross-complaints, Getsen cross-complained against the sellers, Zapf, and another man who had been involved in assisting the sellers with the fraudulent documents. Getsen alleged that Zapf had participated in the fraud, but also asserted a claim for professional negligence against Zapf for his role in the transaction.

After conducting a bench trial, the court found the sellers and the other individual liable for fraud, and found Zapf liable for negligence. The court concluded that the defendants, including Zapf, were jointly and severally liable to Getsen for damages in the amount of $1,027,266.80.

On appeal, Zapf challenges the sufficiency of the evidence to support the trial court's determination that he was negligent. He further challenges the sufficiency of the evidence to support the trial court's damages award. Specifically, he contends that Getsen did not suffer $875,000 in damages as a result of its settlement of the claims between it and the mortgage lender, which permitted Getsen to quiet title to the property, on the ground that Getsen's title insurer, not Getsen, had paid that money to the mortgage lender. He also contends that the trial court should not have awarded Getsen $87,266.87 in "additional expenses" because those damages were "speculative." Finally, Zapf contends that there was not sufficient evidence to support the $65,000 in legal expenses that the trial court awarded.

The trial court's findings and damages award are supported by substantial evidence. We therefore affirm the judgment as to Zapf.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

As the trial court aptly summarized, "This case involve[d] real estate fraud. All parties agree that a fraud was perpetuated, but they all claim not to have actively

3

participated in it, or to have had knowledge about it until after it was completed. Everyone claims to be an innocent victim of the fraud. However, the evidence does not support the claim that all parties to this case were innocent victims of the fraud. In fact, the evidence establishes that some of the parties knowingly and intentionally perpetrated the fraud."

George and Peggy Haber owned a residence in Encinitas, California. In 2006, the Habers executed a note in an amount just over $1.6 million and a deed of trust in favor of their lender to secure repayment of the note. At some point, Aurora Loan Servicing, Inc. (Aurora) assumed the servicing rights to the Habers' loan. By 2009, the Habers were having difficulty making payments on their mortgage. Aurora initiated nonjudicial foreclosure proceedings in July 2009. At the time the foreclosure proceedings were initiated, the Habers owed more on the mortgage than their home was worth.[1]

Two notices of trustees' sales were recorded, on October 26, 2009, and April 16, 2010, respectively. The Habers obtained extensions of these dates while they attempted to sell the Property pursuant to a short sale. The Habers initially were working with Steve Morris, a RE/MAX realtor, to try to sell the property. Morris had arranged for a

---

[1] It appears that the balance remaining on the loan was approximately $1.8 million as of the date foreclosure proceedings commenced.

short sale, having obtained approval of the sale from Aurora, and the Habers were under contract with a buyer.[2]

While the proposed short sale was pending, the Habers met Zapf and Greg Strange. Zapf and Strange pitched a plan to the Habers that purportedly would allow them to avoid foreclosure or a short sale. The plan involved challenging the validity of their debt to their current mortgage holder. Strange and others "referred to the process of sending documents to challenge secured debts as 'the administrative process.' " The trial court found that, "[t]his phrase—'the administrative process'—as used in this case, is a pseudonym for 'the fraud process,' because the process consisted of not only sending letters to challenge the legitimacy of secured debts but it also included the recordation of false documents in the chain of title." Strange advised the Habers that this " 'administrative process' " would allow the Habers to avoid foreclosure and to "walk away with money from their property."

Morris learned of the Habers' plans to terminate the proposed short sale that he had arranged and to use something called the " 'administrative process' " to avoid foreclosure and/or a short sale. Morris advised the Habers both orally and in writing that the proposed plan appeared to be "a 'scam' and a 'fraud.' " Nevertheless, the Habers decided to move forward with the " 'administrative process.' "

---

[2]     The buyer in the short-sale deal had apparently agreed to purchase the property for $1.35 million.

According to the trial court's findings, Zapf "told the Habers, in essence, that the entire banking/real estate industry was crooked, and that the financial system was arranged so that banks could make their money and 'screw the homeowner.' " The Habers authorized Zapf to act as their representative to deal with Aurora regarding their loan. Zapf contacted Aurora a number of times concerning the loan, and was able to negotiate on the Habers' behalf a " 'Foreclosure Alternative Agreement' "—i.e., a forbearance agreement—with Aurora. The forbearance agreement contemplated a series of " 'stipulated payments' " to be made by the Habers over a period of six months, in order to avoid foreclosure. The first payment of $12,283.38 was due on October 4, 2010.

The Habers did not have the financial resources to make any of the required payments. The trial court found that the Habers never intended to make all of the payments as required by the forbearance agreement. The Habers made an initial payment using cash that, according to Mrs. Haber's trial testimony, "was mysteriously delivered to the Habers' home by a courier." However, at her deposition, Mrs. Haber indicated that the cash had been given to the Habers by Strange, who was accompanied by Zapf at the time. The trial court believed Mrs. Haber's deposition testimony, finding her deposition testimony to be more credible than her trial testimony.

Zapf accompanied Mrs. Haber to a bank where she wired the money to Aurora. After receiving these funds, Aurora suspended the foreclosure of the Habers' home. Zapf confirmed with Aurora and the foreclosure trustee that the foreclosure was on hold, and upon receiving confirmation, informed Strange of this fact. The Habers then sent "a

6

series of letters" to Aurora in which they contested the validity of the Aurora loan.  The

Habers purported to " 'cancel' " the underlying deed of trust.[3]  Legal counsel for Aurora

responded to the Habers' letters.  In one letter sent to the Habers, Aurora confirmed that

the Habers owed Aurora $1,908,731.64.  In another letter, Aurora later stated, " 'Aurora

rejects any attempt by you to reassign the duty(s) and benefit(s) of Trustee and

Beneficiary as set forth in the original Deed of Trust.' "  That letter also informed the

Habers that any attempt they might make to reassign the rights and duties under the deed

of trust would be " 'fraudulent' and 'unauthorized.' "

Despite these communications from Aurora, the Habers signed a "phony deed of

trust, reflecting a purported $810,000 loan from 'Real Holdings.' "  The Habers knew that

they did not have a loan from "Real Holdings"[4] for $810,000, but the phony deed of trust

was recorded.  Someone also recorded a "phony reconveyance" of the Aurora loan.  That

document was signed by " 'Daniel Mikac.' "[5]  The reconveyance states that the Aurora

loan had been fully paid and/or satisfied.  This was untrue.

A few weeks after the fraudulent deed of trust and reconveyance were recorded,

Getsen offered to buy the Habers' property for $1,010,000.  The Habers accepted the

---

[3]     The letters appeared to be similar in substance to letters that Strange had sent to
his own lender a year earlier.

[4]     "Real Holdings" is a fictitious entity.

[5]     As the trial court noted, no one at trial presented credible evidence as to the
whereabouts of "Daniel Mikac," or even whether such a person exists.

offer. Zapf, acting as the Habers' real estate agent, prepared a standard form purchase agreement that reflected the offer and acceptance.

Neither the Habers nor Zapf made any disclosures to Getsen about the Aurora loan. Although Zapf "knew (1) about the Habers' outstanding, unpaid obligation to Aurora; (2) that the Getsen purchase price was less than the [balance remaining on the] Aurora loan; (3) that Aurora had recently agreed to forbear from completing a pending foreclosure sale; and (4) that Aurora's forbearance had been induced by a payment made by the Habers using cash provided by Strange," Zapf failed to disclose any of these facts to Getsen.

In connection with the escrow that was opened for the Getsen purchase of the property, the Habers presented a "Seller Information Sheet" that reflected that the only loan on the property was the "phony $810,000 purported loan from 'Real Holdings.' " A " 'payoff statement' " was sent from "Real Holdings" to the escrow company, with instructions to have the payoff wired to a bank account owned and controlled by Strange. At trial, Strange referred to the account as " 'my account.' "

The escrow documents showed that upon the close of escrow, approximately $143,000 would be disbursed to the Habers, and approximately $810,000 would be disbursed to "Real Holdings." Nothing would be paid to Aurora. The Habers signed all of these documents. Zapf knew that the Habers would receive $143,000 from the sale of the property, and that Aurora would receive nothing.

8

Escrow closed. After the payment of title and escrow fees, $814,119.33 was distributed to Strange's bank account, $143,082.32 was distributed to the Habers, and $47,125 was distributed to Zapf's real estate company.

Shortly after escrow closed, Getsen learned that Aurora was attempting to foreclose on the property.

B.     *Procedural background*

Upon learning that Aurora was trying to foreclose on the subject property, Getsen filed a lawsuit against Aurora, asserting that Aurora had no interest in the property and no right to foreclose. Getsen obtained a restraining order preventing a foreclosure sale. At some point, Getsen and Aurora learned of the "phony" documents in the chain of title. Aurora and Getsen filed separate cross-complaints against the Habers, Strange, and Zapf, among other parties. Aurora filed its initial cross-complaint for fraud, conspiracy, and cancellation of void instruments against the Habers, Strange, Mikac, and Real Holdings in March 2011.[6] Getsen filed its cross-complaint for fraud, negligent misrepresentation, breach of contract, unjust enrichment, negligence and slander of title against the Habers, Zapf, Bug Realty, Strange, Mikac and Real Holdings in May 2011.

Getsen and Aurora settled their claims against each other. Getsen agreed to pay $875,00 to Aurora, through its title insurer, Stewart Title, in exchange for Aurora

---

[6]     Aurora amended its cross-complaint to name Zapf as a cross-defendant in June 2011.

granting a genuine reconveyance of its deed of trust, which would enable Getsen to sell the property to a third party. Title to the property was cleared at the end of August 2011.

Shortly before trial was scheduled to begin in early 2012, the Habers and Strange filed for bankruptcy protection. The claims against them were stayed, and the trial was continued. Getsen and Aurora were able to obtain orders from the bankruptcy court lifting the stay of the claims against the Habers and Strange. The trial court held a bench trial on Getsen's and Aurora's claims against the Habers, Strange, and Zapf in June 2012.

At the conclusion of the presentation of evidence, the trial court took the matter under submission. On July 30, 2012, the trial court issued a 22-page statement of decision. In that statement of decision, the court determined that Getsen prevailed on its claims for fraud and negligent misrepresentation against the Habers and Strange. The court further concluded that Getsen prevailed on its claim for unjust enrichment against the Habers, Strange, and Zapf. Finally, the court concluded that Getsen prevailed on its claim of negligence against Zapf.[7] The court awarded damages of $1,027,266.80 in favor of Getsen and against Zapf, holding Zapf jointly and severally liable with the Habers and Strange for the total amount. The $1,027,266.80 included $875,000 in compensatory damages "paid by Getsen to Aurora to clear title to the property," $87,266.87 "in 'additional expenses' incurred by Getsen in carrying the property while

---

[7]    The trial court also determined that Aurora had proven its claim for fraud against the Habers and Strange.

title was being cleared," and $65,000 "in legal expenses incurred by Getsen to clear title to the property, awarded under the 'tort of another' doctrine."

The trial court entered judgment on August 27, 2012. Zapf filed a timely notice of appeal.

III.

DISCUSSION

Zapf challenges four of the trial court's findings on the ground that the evidence is insufficient to support them. First, Zapf argues that there is insufficient evidence to support the court's finding that he was negligent. Zapf also takes issue with the amount of damages that the court awarded, arguing that there is insufficient evidence to support an award against Zapf for (1) the $875,000 that was paid to Aurora to clear title to the property; (2) the $87,266.87 in "additional expenses" incurred by Getsen in carrying the property while attempting to clear title; and (3) $65,000 in legal expenses incurred by Getsen to clear title to the property.

A.    *Legal standard pertaining to claims of insufficiency of the evidence*

"Where findings of fact are challenged on appeal, we are bound by the 'elementary, but often overlooked principle of law, that . . . the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor."

11

(*Garbell v. Conejo Hardwoods, Inc*. (2011) 193 Cal.App.4th 1563, 1569.)  The

substantial evidence standard of review applies to findings with respect to the elements of

a claim for negligence.  (*Ibid*.)

B.     *Analysis*

    1.     *Professional negligence*

Zapf contends that the evidence at trial "established that Appellant Zapf did not

breach any duty owed to the buyer of the Property, Getsen."  According to Zapf, "it is

undisputed Appellant Zapf met his duty of disclosure since Getsen's managing member,

Mr. Duden, testified that he knew prior to the close of escrow that the Property was

encumbered in the approximate amount of $1.6 million and Appellant Zapf informed him

that escrow could not close unless clear title could be delivered."  Zapf contends that the

trial court "ignored this true evidence" and improperly found him to have been negligent.

We disagree with Zapf's representations regarding the evidence in the record, and

conclude that there is substantial evidence to support the trial court's determination that

Zapf may be held liable for professional negligence with respect to his role in this

transaction.

"The elements of a claim for professional negligence incorporate a specific

standard of care into the elements of a negligence claim."  (*Burgess v. Superior Court*

(1992) 2 Cal.4th 1064, 1077.)  " 'The elements of a cause of action in tort for professional

negligence are: (1) the duty of the professional to use such skill, prudence and diligence

as other members of his profession commonly possess and exercise; (2) a breach of that

12

duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. [Citations.]' " (*Ibid.*)

The trial court relied on *Holmes v. Summer* (2010) 188 Cal.App.4th 1510 (*Holmes*) to conclude that Zapf acted negligently in his dealings with Getsen. In *Holmes*, the appellate court determined that a seller's real estate agent or broker is under the same duty of disclosure as a seller to disclose *known facts that materially affect the value or desirability of a property*, and that the failure of an agent or broker to disclose such facts constitutes negligence. (*Id.* at pp. 1518-1519.) The facts that must be disclosed, if known, include "impediment[s] to the ability of the seller to convey title free and clear of monetary liens and encumbrances." (*Id.* at p. 1520.)

The *Holmes* court explained:

> "[T]he rule we articulate in this case is simply that when a real estate agent or broker is aware that the amount of existing monetary liens and encumbrances exceeds the sales price of a residential property, so as to require either the cooperation of the lender in a short sale or the ability of the seller to put a substantial amount of cash into the escrow in order to obtain the release of the monetary liens and encumbrances affecting title, the agent or broker has a duty to disclose this state of affairs to the buyer, so that the buyer can inquire further and evaluate whether to risk entering into a transaction with a substantial risk of failure." (*Holmes*, *supra*, 188 Cal.App.4th at pp. 1522-1523.)

The reason for this rule is as follows: "While a buyer may be harmed by acquiring title to a property with undisclosed defects, such as hazardous waste or soil subsidence problems, a buyer may also be harmed by entering into an escrow to purchase property

13

when it is highly likely that, unbeknownst to the buyer, the escrow will never close. We must bear in mind that the main purposes of the rule expressed in *Lingsch v. Savage* [(1963)] 213 Cal.App.2d 729, 'are to protect the buyer from the unethical broker and seller and to *insure that the buyer is provided sufficient accurate information to make an informed decision whether to purchase*.' [Citation.]" (*Holmes*, *supra*, 188 Cal.App.4th at p. 1519, italics added.) To impose a duty on real estate agents and brokers to disclose information that would alert a potential buyer that the sale is at high risk of failure "would be to further the purpose of protecting buyers from harm and providing them with sufficient information to enable them to wisely choose whether to enter into the transaction." (*Id.* at p. 1520.)

Applying the rule in *Holmes* to this case, the trial court found the following:

"Here, Zapf knew, from his own dealings with the Habers and Aurora, that the Habers were delinquent on their existing mortgage, that Aurora had initiated foreclosure proceedings, that Aurora had agreed to forbear from concluding the foreclosure in exchange for receiving certain payments from the Habers, and that the agreed-upon payments had not yet been made in full by the Habers. Zapf also knew that the Habers were upside down on their Aurora mortgage—that the property was worth less than the amount owed by the Habers.

"Zapf prepared the purchase agreement whereby Getsen would acquire the Habers' property for an amount less than the debt owing to Aurora. Yet, Zapf failed to disclose to Getsen any of the facts mentioned above—namely, that the proposed purchase price was less than the amount owed by the Habers on their existing mortgage . . . , that Aurora had initiated foreclosure proceedings, that Aurora had agreed to forbear from concluding the foreclosure in exchange for receiving certain payments from the Habers, that the agreed-upon payments had not yet been made by the Habers, *and*

14

*that Strange had provided the cash used by the Habers to induce Aurora to forbear from foreclosing*."  (Italics added.)

Based on these findings, the court ultimately concluded "that Zapf failed to fulfill his duty to disclose to Getsen material information that was known to Zapf at the time that the fraud was being perpetrated.  Had Zapf disclosed the information, the fraud would almost certainly have been detected before it was consummated."  There is substantial evidence to support the court's findings and its conclusion regarding Zapf's liability.  The evidence clearly demonstrates that Zapf was aware of virtually all of the facts identified in *Holmes*, but did not disclose them.  In addition, Zapf was aware that the Habers had not used their own money to make the limited number of forbearance payments that were made, and that Strange was somehow involved in making those payments.  Further, Zapf testified that although he knew that the amount owed on the Aurora loan was more than $1.6 million and that purchase price was ultimately only $1,010,000, he "didn't pay much attention to the—what was owed."  Zapf also acknowledged that he knew that the Habers did not have sufficient income to make their normal mortgage payments on the property.  Beyond this, Zapf became aware that the Habers were to receive a significant sum of money from the proceeds of the sales transaction, and that a relative of the Habers was to receive a significant sum of money as well; Zapf admitted that he found some of the "details" of the transaction "odd."  Despite knowing these facts, Zapf marketed the property for an amount that was far less than what the Habers owed Aurora, prepared a purchase agreement for an amount that was far

15

less than the amount of the existing liens, and played his role as the sellers' real estate agent in ensuring that the transaction would go forward, without disclosing any of this relevant information to Getsen. There is abundant evidence to support the trial court's finding that Zapf was aware of facts that materially affected the desirability of the property, yet failed to disclose these facts to Getsen.

Zapf suggests that he should not be held liable for his failure to disclose these facts because Getsen, through Duden, "knew that there was a substantial risk that the Habers could not transfer title free and clear of monetary liens and encumbrances." Zapf bases this assertion on Duden's testimony that he knew that Aurora had a deed of trust recorded on the property for $1.6 million, apparently based on a "third-party report" that Duden had received that included information about the Aurora deed of trust. However, as Zapf acknowledges, in deciding to proceed with the transaction, Duden testified that he relied on the title company's issuance of a title policy on the property, which did not show Aurora's deed of trust as outstanding. Regardless what other "reports" Duden may have had access to, Zapf, as the seller's real estate agent, owed Getsen, as the buyer, "the affirmative duties of care, honesty, good faith, fair dealing and disclosure, as reflected in Civil Code section 2079.16, as well as such other nonfiduciary duties as are otherwise imposed by law." (*Holmes*, *supra*, 188 Cal. App.4th at p. 1528.) If Zapf had acted in accordance with these duties and disclosed to Getsen the information that he had about the Aurora loan, as well as his knowledge that the Habers did not have the financial wherewithal to make the required forbearance payments, and that Strange had provided

16

the Habers with the funds for those payments, Getsen would undoubtedly have approached the transaction with a different perspective. As the trial court concluded, Getsen could have discovered the fraud at the time it was being perpetrated, rather than going through with the transaction and discovering the fraud only much later. Quite simply, Getsen would have had reason to question what was going on at an earlier stage in the process, and would have known what the real risks of moving forward with the transaction were. There is thus substantial evidence to support the trial court's finding Zapf liable on Getsen's claim for professional negligence.

2. *Compensatory damages of $875,000*

Zapf contends that Getsen did not suffer damages in the amount of $875,000 because Stewart Title paid the $875,000 to Aurora, on Getsen's behalf, to settle the claims between Aurora and Getsen and ultimately quiet title. Zapf contends that since there is no evidence that Getsen, itself, paid the $875,000, there is insufficient evidence to uphold the trial court's award of this amount to Getsen. We disagree that Zapf may avoid liability for the $875,000 that the trial court determined he owed Getsen under this theory.

Getsen apparently transferred its interest in the litigation to Stewart Title upon Stewart Title's payment to Aurora in satisfaction of Getsen's claim under the title insurance policy that Getsen purchased from Stewart Title. However, by operation of contract and under statutory law, Getsen may continue this action to its completion in its own name.

17

Generally, a defendant has a statutory right to have an action prosecuted against him in the name of the real party in interest. (Code Civ. Proc., § 367; *Giselman v. Starr* (1895) 106 Cal. 651, 657.) "The real party in interest is 'the person possessing the right sued upon by reason of the substantive law.' [Citation.]" (*Ventura County Ry. Co. v. Hadley Auto Transport* (1995) 38 Cal.App.4th 878, 880.) However, in a situation in which a party transfers its interest in *a pending action or proceeding*, Code of Civil Procedure section 367 does not apply. Rather, in such a circumstance, " '[t]he action or proceeding may be continued in the name of the original party . . . .' (Code Civ. Proc., § 368.5.)"[8] (*Casey v. Overhead Door Corp*. (1999) 74 Cal.App.4th 112, 121 (*Casey*), overruled on other grounds in *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 478, 481.)[9] "[T]he law allows the assignees . . . to pursue the action in the name of the assignor . . . for their own protection and benefit." (*Casey*, *supra*, at p. 121, fn. 6.)

---

[8]     Code of Civil Procedure section 368.5 provides:
> "An action or proceeding does not abate by the transfer of an interest in the action or proceeding or by any other transfer of an interest. The action or proceeding may be continued in the name of the original party, or the court may allow the person to whom the transfer is made to be substituted in the action or proceeding."

[9]     "In the event of a transfer of interest in a pending action, the attorney for the nominal party/assignor does not automatically cease to be the attorney of record. (See, e.g., *Davis v. Rudolph* (1947) 80 Cal.App.2d 397, 401; *Tuffree v. Stearns Ranchos Co.* (1899) 124 Cal. 306; *Crescent Canal Co. v. Montgomery* (1899) 124 Cal. 134.)" (*Casey*, *supra*, 74 Cal.App.4th at p. 121.) "[T]he attorney of record [generally] has the exclusive right to appear in court for his client and to control the court proceedings, so that neither the party himself [citations], nor another attorney [citations], can be recognized by the

18

Getsen is the real party in interest to the rights that it originally sued upon in its cross-complaint against these parties since Getsen is the party that suffered the injury from the Habers' and Strange's fraud, and Zapf's negligence. However, by operation of law and pursuant to the terms of the title insurance policy, when Stewart Title paid $875,000 to settle Getsen's claim, which occurred while this litigation was pending, Stewart Title took over Getsen's interest in the action. The title insurance policy obtained by Getsen from Stewart Title provides, in relevant portion:

> "When we settle your claim, we have all the rights you have against any person or property related to this claim. You must transfer these rights to us when we ask, and you must not do anything to affect these rights. You must let us use your name in enforcing these rights."

Upon the payment of the $875,000 to Aurora to settle the claims between Aurora and Getsen, Stewart Title "ha[d] all of the rights [Getsen] ha[d] against" the third parties. In essence, Stewart Title was the subrogee to Getsen's rights against Zapf and the other cross-defendants. " 'Subrogation is defined as the substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim. By undertaking to indemnify or pay the principal debtor's obligation to the creditor or claimant, the "subrogee" is equitably *subrogated* to the claimant (or "subrogor"), and succeeds the subrogor's rights against the obligor. [Citation.] In the case of insurance, subrogation takes the form of an insurer's right to be put in the position

court in the conduct or disposition of the case." (*Wells Fargo & San Francisco* (1944) 25 Cal.2d 37, 42-43.)

19

of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid.  [Citations.]'  [Citation.]"  (*Gulf Ins. Co. v. TIG Ins. Co.* (2001) 86 Cal.App.4th 422, 430-431.)

Stewart Title became subrogated to Getsen's negligence claim against Zapf, the Habers, and Strange, both equitably and pursuant to the terms of the title insurance policy, after Stewart Title paid the $875,000 sum to settle Aurora's claims against Getsen. However, under Code of Civil Procedure section 368.5, Getsen remained a proper plaintiff to prosecute the claims that transferred to Stewart Title.  Further, this presented no prejudice to the third party defendants.  Getsen's and Stewart Title's rights as to Zapf, the Habers, and Strange were identical because Stewart Title's interest was derivative of Getsen's interest in the litigation:  " 'The right of subrogation is purely derivative. An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured.  The subrogated insurer is said to " 'stand in the shoes' " of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured.' [Citation.]"  (*Gulf Ins. Co. v. TIG Ins. Co., supra,* 86 Cal.App.4th at p. 431.)  In addition, the same defenses that Zapf raised to Getsen's claims could have been asserted against Stewart Title in a direct subrogation action.  For all purposes, any claim that Stewart Title possessed and the negligence claim that Getsen brought against Zapf were the same.  Further, the judgment in this case would prevent any future subrogation action by Stewart Title against Zapf on Getsen's underlying negligence claim, since, under California law, double recovery is

20

barred for the same wrong. "Only one complete satisfaction is permissible, and if partial satisfaction is received from one, the liability of others will be correspondingly reduced." (6 Witkin, Summary of California Law (10th ed.) Torts, § 1550, p. 1023.)

Stewart Title was aware of the lawsuit, and specifically, of Getsen's claims against the cross-defendants, including Zapf. The cross-complaints against the Habers, Strange and Zapf had been filed by the time Stewart Title paid the $875,000 to Aurora on behalf of Getsen. The settlement between Aurora and Getsen, and the resultant clearing of title did not occur until the end of August 2011, whereas Aurora's and Getsen's cross-complaints against the third-party defendants were filed in the spring of 2011. In addition, John Duden, the principal member of Getsen, testified that Getsen consented to allowing Stewart Title to use Getsen's name in enforcing its rights, and Stewart Title is the entity that hired attorneys to represent Getsen at trial.

There is thus substantial evidence to support the trial court's award of $875,000 in damages to Getsen as a result of Zapf's negligence.

To the extent that Zapf suggests that "Stewart Title did not pay Aurora $875,000.00 for the benefit of Getsen," but "[i]nstead, . . . paid Aurora $875,000.00 to settle its own negligence and wrongdoing in this case," the procedural history demonstrates otherwise. Getsen and Aurora were in litigation with each other. Stewart Title was not a party to the action. Only after Stewart Title paid the $875,000 to Aurora did Getsen and Aurora dismiss their claims against each other. Clearly, Stewart Title's

21

payment was made to Aurora on *Getsen*'s behalf, so that *Getsen* could receive clear title to the property and could move forward with selling the property to a third party.

Zapf contends that Stewart Title is not entitled to rely on subrogation because it, "not Appellant Zapf—is responsible for any loss suffered by Getsen." He contends that Stewart Title mishandled the preliminary title report that it created with respect to the Haber property. Zapf cites to his own testimony that a Stewart Title employee made a comment to him during a telephone call to the effect that Stewart Title had made a mistake and "should not have insured the Property,"[10] to suggest that Stewart Title is the party that is responsible for Getsen's loss. However, the trial court specifically found that *Zapf* was negligent in his duties to Getsen, and that *Zapf's* negligence was a proximate cause of the injuries that Getsen suffered as a result of purchasing a property that remained subject to a foreclosure action by Aurora. At no point in the litigation was there evidence presented that placed fault on Stewart Title, and the trial court made no finding that Stewart Title was responsible for Getsen's damages.[11]

3.    *$87,266.87 in additional expenses incurred by Getsen*

---

[10]    Zapf's contention was directly contradicted by that employee's testimony at trial. The trial court specifically found the employee's trial testimony to be credible.

[11]    The trial court's findings in this case indicate that the fraud that was perpetrated by the Habers and Strange was perpetrated on Getsen, Aurora, and Stewart Title, as well. As the parties stated in their Joint Trial Readiness Conference Report, "the Reconveyance appeared valid on its face," and for this reason, "Getsen had no reason to know of the Aurora [deed of trust]." It is unclear how Stewart Title would have, or reasonably should have, been aware that these documents were fraudulent at the time it searched the public record, given that the fraudulent reconveyance "appeared valid on its face."

Zapf contends that the trial court should not have awarded Getsen $87,266.87 in "additional expenses" because those claimed damages were "speculative." He asserts that "[t]he only possible damage Getsen suffered with respect to any 'negligence' is the loss of approximately $10,000.00 on the ultimate sale price of the Property . . . and maintenance costs during the time in which Getsen worked to clear title on the Property." Zapf further contends that "these damages are speculative and therefore cannot support the damage award."

In awarding the $87,266.87 in " 'additional expenses' claimed by Getsen," the trial court specifically referred to "Trial exhibit [No.] 146." The court stated that it was "declin[ing] to award any of the so-called 'expected revenue decrease from loss of investors' because the Court believes that those claimed damages are speculative." The trial court also declined to award "a portion of the 'other carry costs and additional rehab[ilitation] required to prepare house for sale' because the Court believes those costs were not incurred as a result of any action or inaction on the part of any cross-defendant, but instead are normal rehabilitation costs that would have been incurred regardless of any action or inaction on the part of any cross-defendant."

Trial exhibit No. 146 was offered by Getsen and received in evidence by the trial court without objection. The "additional expenses" identified in trial exhibit No. 146 include $10,000 for the "Difference in gross sale proceeds"; $11,192.92 for eight months of prorated property tax payments; $37,333.33 for carrying additional debt of $400,000 at a 14 percent interest rate for eight months; and $36,907.12 for "All other carry costs and

23

additional rehab required to prepare house for sale." Duden testified that until Getsen was able to clear title and sell the property, Getsen had to carry certain costs, including utility expenses, taxes, maintenance on the property, and hazard insurance. In addition, Getsen continued to carry debt that it had used "for leverage purposes," and this debt was "quite expensive."

The trial court based its award of "additional costs" on Duden's testimony and the documentary evidence that was offered by Getsen and admitted without objection. These damages were not speculative, but rather, were in fact suffered by Getsen and were established by the evidence that Getsen presented. The trial court reduced the amount awarded to Getsen for "additional rehab required to prepare house for sale" on the ground that such amounts were not attributable to the conduct of the cross-defendants, but rather, would have been required regardless of the conduct of any of the cross-defendants. The court also rejected, as speculative, an additional amount claimed by Getsen in trial exhibit No. 146, i.e., $90,000 in "Expected revenue decrease from loss of investors." The trial court thus eliminated from Getsen's claimed additional damages those damages that were truly speculative. The remainder of the "additional damages" that Getsen claimed were not speculative, and there is substantial evidence to support the trial court's award of such damages.

4. *$65,000 in legal expenses incurred by Getsen*

In awarding legal expenses to Getsen, the trial court stated, "The $65,000 in legal expenses reflects the Court's determination of the reasonable amount of legal expenses

24

actually incurred by Getsen to clear title."  Although generally damages in a tort action do not include compensation for attorney fees or other litigation costs, Zapf acknowledges that there is an exception to this rule when a party, through the tort of another, has been required to act to protect his or her interests by bringing or defending an action.  In such an instance, that party is entitled to recover attorney fees and other expenditures incurred in litigating that action.  (See, e.g., *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 505.)  However, Zapf argues that "Getsen did not present any evidence of its alleged attorney's fees incurred to clear title to the Property."  He asserts that no "testimony was offered and no documentary evidence was introduced to support this claimed damage."  We conclude that there was sufficient documentary evidence to support the trial court's conclusion that Getsen was entitled to claim $65,000 in attorney fees and costs for litigating with Aurora in an attempt to clear title.

The trial court relied on trial exhibit No. 120, which consists of Getsen's counsel's invoices.  The court received this exhibit in evidence.  The court awarded Getsen its attorney fees based on these invoices for work performed during the time period that Getsen was attempting to protect its interest in the property by clearing title to the property—i.e., from the start of litigation to the point at which title to the property cleared.  The invoices contained in trial exhibit No. 120 constitute substantial evidence to support the portion of the trial court's award of damages based on the attorney fees that Getsen incurred in protecting its interest in the property against Aurora's claims.

25

IV.

DISPOSITION

The judgment is affirmed.  Getsen is entitled to costs on appeal.


_____

AARON, J.

WE CONCUR:

_____

HUFFMAN, Acting P. J.

_____

IRION, J.